FILED
2007 Sep-20  PM 01:23
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| PENNY ALLEN, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| vs. | ] | 7:06-CV-2150-LSC |
| | ] | |
| DOLGENCORP, INC., *et al.*, | ] | |
| | ] | |
| Defendants. | ] | |

| | | |
|---|---|---|
| BERYL DAUZAT, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| vs. | ] | 7:06-CV-2160-LSC |
| | ] | |
| DOLGENCORP, INC., *et al.*, | ] | |
| | ] | |
| Defendants. | ] | |

| | | |
|---|---|---|
| DEBORAH FRANCIS, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| vs. | ] | 7:06-CV-2164-LSC |
| | ] | |
| DOLGENCORP, INC., *et al.*, | ] | |
| | ] | |
| Defendants. | ] | |

REGINA FRANKLIN,                     ]
                                     ]
     Plaintiff,                      ]
                                     ]
     vs.                             ]        7:06-CV-2165-LSC
                                     ]
DOLGENCORP, INC., *et al.*,          ]
                                     ]
     Defendants.                     ]


MICHAEL HADAWAY,                     ]
                                     ]
     Plaintiff,                      ]
                                     ]
     vs.                             ]        7:06-CV-2171-LSC
                                     ]
DOLGENCORP, INC., *et al.*,          ]
                                     ]
     Defendants.                     ]


CATHY THOMAS,                        ]
                                     ]
     Plaintiff,                      ]
                                     ]
     vs.                             ]        7:06-CV-2204-LSC
                                     ]
DOLGENCORP, INC., *et al.*,          ]
                                     ]
     Defendants.                     ]

WANDA WOMACK,                     ]
                                 ]
        Plaintiff,               ]
                                 ]
        vs.                      ]          7:06-CV-2213-LSC
                                 ]
DOLGENCORP, INC., *et al.*,      ]
                                 ]
        Defendants.              ]

## MEMORANDUM OF OPINION

I.      Introduction.

        The Court has for consideration the Motions for Summary Judgment,

filed by Defendant Dolgencorp, Inc.[1] ("Defendant") on June 22, 2007,

against Plaintiffs Penny Allen ("Allen"), Beryl Dauzat ("Dauzat"), Deborah

Francis ("Francis"), Regina Franklin ("Franklin"), Michael Hadaway

("Hadaway"), Cathy Thomas ("Thomas"), and Wanda Womack ("Womack")

(collectively referred to as "Plaintiffs").   Plaintiffs filed suit against

Defendant for recovery of unpaid overtime compensation allegedly owed to

Plaintiffs pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201

---

[1]Defendants Dolgencorp of Texas, Inc., Dolgencorp of New York, and Dollar General Partners are separately contesting personal jurisdiction and venue.  They do not join in this Motion and have not waived their challenge to jurisdiction and venue.

*et seq.* ("FLSA").[2]  In its motion, Defendant argues that Plaintiffs were properly classified as exempt under the FLSA's executive exemption, thus entitling Defendant to judgment as a matter of law.

The issues raised in Defendant's Motions for Summary Judgment have been briefed by both parties, presented at oral argument, and are now ripe for decision.  Upon full consideration of the legal arguments and evidence presented by the parties in this case, Defendant's Motions for Summary Judgment are granted.

---

[2]The parties to this case initially opted into an FLSA class action styled as *Brown v. Dolgencorp, Inc.*, (7:02-cv-0673-UWC).  The class was subsequently decertified by the district court judge presiding over the trial of that case and Plaintiffs were allowed to refile individually.  More than two thousand individual Plaintiffs were named in one complaint.  That case was styled *Gray et al v. Dolgencorp, Inc. et al* (7:06-cv-01538-LSC).

Defendant filed a motion to dismiss all but one of the individual claims as improperly filed, or in the alternative, to sever the individual Plaintiffs' claims for separate trials.  Defendant's motion was granted in part with the claims of the individual Plaintiffs being severed into individual actions.  The Court then required Plaintiffs to pay a filing fee in each action that they intended to prosecute, allowing them to dismiss any they felt should not proceed.

There remains 1,610 individual cases pending in this Court against Defendant alleging the same violation of the FLSA.

This Court has, at the request of the parties, withheld consideration of any issues dealing with the appropriateness of transferring any of the pending matters to other courts throughout the country.  This Court agreed to retain and manage the cases through discovery and to permit the filing of transfer motions at that time if needed.

These seven individual cases were selected by both parties to be expedited for disposition.  This was not done to control the outcome of the remaining cases, but to allow the parties an opportunity to rapidly address common legal issues.

II.    Facts.[3]

    A.    Collective Facts.

Defendant operates over 8,200 retail stores under the trade name "Dollar General" in thirty-five states, including Alabama.  (Doc. 25 at 3.) Dollar General is a retailer of consumer goods, including cleaning supplies, health and beauty aids, foods/snacks, housewares, toys, and basic apparel. *Id*. at 2.  Each of the seven Plaintiffs served as the store manager at one or more of Defendant's stores within the State of Alabama.  (Doc. 2 ¶ 3.)

Each store is managed pursuant to Defendant's Standard Operating Procedures ("SOP") manual and the merchandise is set up according to a plan-o-gram.[4]   (Doc. 50 at 5-6.)   Prior to the implementation of an automatic replenishing system, ordering merchandise involved referring to

_____

[3]The facts set out in this opinion are taken from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the non-moving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[4]The SOP manual is a step-by-step instruction guide for completing the tasks within the store.  The Plan-o-gram is a map showing where to place the merchandise in the store.  Merchandise that is not included in the plan-o-gram is shipped with a separate plan-o-gram or planner.

the plan-o-gram to determine if the pre-established quantities of merchandise were on the shelves. *Id.* Store managers are not responsible for ordering for the whole store because hourly, non-exempt, employees order certain merchandise for different zones. *Id.* If a plan-o-gram does not conform to the layout of the building where the retail store is located, the district manager and/or regional manager makes the necessary changes. *Id.*

Dollar General stores operate under the direction and supervision of a district manager, a store manager, assistant store manager, third key,[5] and multiple store clerks. (Doc. 25 at 3.) The stores have an average of 7 to 8 employees, 4 to 5 of whom are clerks. *Id.* The store managers report to a district manager, who oversees between 15 and 25 stores. *Id.* The district managers are responsible for visiting their stores approximately once per month, but they do not have keys to the stores they oversee. *Id.*

Each Dollar General store manager supervises the work of two or more other full-time employees or full-time employee equivalents. *Id.* at 4. Store managers, who are paid on a guaranteed weekly salary basis, are also eligible for bonuses, such as an annual "Teamshare" bonus, if their store

---

[5]This position was also referred to as the "Lead Clerk."

performs well.[6]  *Id.* at 6.  Assistant store managers are the only other Dollar General employees who have ever been eligible for "Teamshare" bonuses; however, their eligibility was eliminated in 2006 when the company changed its bonus policy.  *Id.* at 7.  Even when assistant managers were eligible for bonuses, the amount they were eligible to receive was substantially less than the store manager could receive.  *Id.*

Plaintiffs performed many duties identified as "managerial" in nature by the Department of Labor ("DOL") regulations, including: interviewing, selecting, and training employees; setting employees' hours; directing employees' work and assessing their job performances, including promotion recommendations; handling employee grievances; planning and apportioning the workload of the store among the employees; controlling the flow of merchandise in the store; seeing to the safety of employees and to the security of the premises; controlling budgets; and monitoring and implementing legal compliance measures.[7]

---

[6]This bonus system was available to each of the seven Plaintiffs.

[7]*See Allen v. Dolgencorp, Inc.,* 7:06-CV-2150-LSC (Doc 22 at ¶ 7); *Dauzat v. Dolgencorp, Inc.,* 7:06-CV-2160-LSC (Doc. 57 at ¶ 7); *Francis v. Dolgencorp, Inc.,* 7:06-CV-2164-LSC. (Doc. 20 at ¶ 10); *Franklin v. Dolgencorp, Inc.,* 7:06-CV-2165-LSC. (Doc. 16 at ¶ 8); *Hadaway v. Dolgencorp, Inc.,* 7:06-CV-2171-LSC. (Doc. 21 at ¶ 9); *Thomas v.*

However, store managers are not permitted to perform some tasks. For instance, store managers must receive permission to go to the store after hours and they are not allowed to give store keys to employees. *Id.* at 7. They are also subject to discipline if they exceed the labor budget provided by Defendant. *Id.* Store managers do not set the rates of pay for new employees but must go by company guidelines; merit raises are automatically given without input from the store manager. *Id.* In addition, store managers cannot hire or terminate assistant managers or lead clerks without district manager approval. *Id.* In the event of a tornado warning, store managers cannot close the store without first consulting with the district manager. *Id.* at 8. Also, store managers cannot discount items for the purpose of having a sale, nor can they display merchandise on the sidewalks without corporate approval. *Id.* Store managers cannot set the hours of operation for the store to reflect customer trends, and they are not permitted to exchange merchandise with another store if they are out of a certain product. *Id.* Store managers are prohibited from putting up flyers

*Dolgencorp, Inc.,* 7:06-CV-2204-LSC. (Doc. 55 at ¶ 7)*; and Womack v. Dolgencorp, Inc.,* 7:06-CV-2213-LSC (Doc. 11 at ¶ 6).

or notices in store windows announcing local community events or charity functions and they cannot advertise on T.V., radio, or newspaper for the stores. *Id*. Finally, store managers do not have authority to decide whether to prosecute shoplifters. *Id*.

Dollar General evaluates its store managers in seven different categories: sales volume, inventory shrink, safety awareness, training and development, controllable expenses, customer satisfaction and merchandising. *Id*. at 7. These ratings determine pay increases or result in a course of progressive counseling. *Id*.

In 2003, Defendant initiated a uniform, formalized training program for its store managers, calling for them to receive two weeks of in-store training and two weeks in a classroom environment. *Id*. at 8. Training of all the other store employees is the store manager's responsibility. *Id*. Dollar General's recruiting department employs field recruiters who seek to identify and recruit candidates to become store managers. *Id*. This department does not recruit for any other store position. *Id*.

B.    Penny Allen.[8]

Allen worked as the store manager in store #7362 in Leeds, Alabama, from February 28, 2001, to October 17, 2002.  (Doc. 22 at ¶ 1.)  While employed by Defendant, Allen reported to the district manager,[9] who left her daily voicemail messages.  *Id.*  Her salary as store manager ranged from $550 to $566.50 per week, while the assistant manager and third key in her store earned between $6.25 and $8.00 per hour.  *Id.* at ¶¶ 3, 5.  Although she was told she would work 45 hours per week, Allen typically worked at least 60 hours per week.  (Doc. 53 at ¶ 2.)

In her deposition, Allen acknowledged that she was "held accountable for getting  [ ] things done."  *Id.* at ¶ 13.  However, she also asserts that many of her "managerial" duties were very limited.  For instance, she alleges that the organization of all areas of the store were either dictated by the plan-o-gram or by her district manager.  (Doc. 53 at ¶ 1.)  She also needed the district managers permission to make decisions on product

_____

[8]The documents cited in this fact section are from *Allen v. Dolgencorp, Inc.,* 7:06-CV-2150-LSC.

[9] Three individuals held this position while Allen was the store manager: Melvin Howard, Mark Nichols, and Ed Gerhardt.  (Doc. 22 ¶ 6.)

placement, change pay rates for newly hired employees, deal with a rodent infestation, or pay for glass cleaning services.  *Id.* at ¶¶ 1, 4, 9.

Allen also performed non-managerial duties, such as assisting other stores with inventory duty, stocking shelves, and cleaning, which she estimates took up 85% of her time.  *Id.* at ¶¶ 3, 6, 8.  In Allen's opinion, her most important duties were taking care of customers, stocking shelves, and making sure the store was clean.  *Id.* at ¶ 6.

C.    Beryl Dauzat.[10]

Dauzat worked as the store manager in store #3828 in Trussville, Alabama, from November 15, 1999, to February 24, 2001, and in store #4110 in Roebuck, Alabama, from February 24, 2001, to January 10, 2003.  (Doc. 16 at ¶ 1.)  Her salary during her employment with Defendant ranged from $425 to $618 per week, while the assistant managers in the store earned between $6.00 and $8.00 per hour.  *Id.* at ¶¶ 3, 8.  Although she was told that she would work between 45 and 48 hours per week, Dauzat claims that she routinely worked 75 hours per week.  (Doc. 57 at ¶ 1.)

---

[10]The documents cited in this fact section are from *Dauzat v. Dolgencorp, Inc.,* 7:06-CV-2160-LSC.

While employed by Defendant, Dauzat reported to the district manager.[11] Dauzat testified that the frequency of the store visits varied per district manager, but she estimates that they lasted anywhere from thirty minutes to three hours.  *Id.*

Dauzat acknowledges that she was the "captain of the ship."  *Id.* at ¶ 11.   She was responsible for distributing and interpreting employee handbooks, implementing the SOP manual, and handling discipline.  *Id.* at ¶¶ 11-13.

However, Dauzat asserts that many of her "managerial" duties were very limited.  For instance, Dauzat alleges that she was not empowered, absent the district manager's approval, to hire assistants, authorize overtime work for employees, set starting pay rates in excess of the norm, or approve payout functions over a certain amount from the cash register.  (Doc. 57 at ¶¶ 3, 4, 8.)  She further contends that she lacked the discretion to order products outside of the merchant formula provided to her by Defendant.  *Id.* at ¶ 6.  Dauzat also performed duties such as unloading

---

[11]Five individuals held this position while Dauzat was the Store Manager: Bill Dickinson, Chuck Till, Melvin Howard, Mark Nichols, and Ed Gerhardt.  *See* Dauzat Comm. Evid. 1, Dauzat Depo. 1, pp. 76-78.

trucks, putting out freight, working from plan-o-grams, and working recovery. *Id*. at ¶ 2. On occasion, Dauzat was sent to other Dollar General stores to perform clean-up duties, which took anywhere from 1 to 2 days to complete. *Id*. at ¶ 7. She believes the most important aspects of her job as store manager were putting out freight and having the store well merchandised, as opposed to making good hiring decisions. *Id*. at ¶ 5.

D.    Deborah Francis.[12]

Francis worked as the store manager in store #3824 in Graysville, Alabama, from July 21, 2001, to January 21, 2003. (Doc. 20 at ¶ 2.) Francis previously worked as a store clerk and third key, prior to being promoted to store manager. *Id*. at ¶ 1. As a manager, Francis was paid on a salary basis between $500 and $515 per week, while her assistant store managers were paid approximately $7.00 per hour.[13] *Id*. at ¶¶ 4, 9. Francis was told she would be working 45 to 50 hours a week as a store manager; however, she

---

[12]The documents cited to in this fact section are from *Francis v. Dolgencorp, Inc.*, 7:06-CV-2164-LSC.

[13]In converting this to a 40 hour work week, this translates to an average weekly wage of $280.

claims that she actually worked between 70 and 80 hours each week.  (Doc. 50 at ¶¶ 2, 8.)

As store manager, Francis reported to a district manager whose visits to the store lasted anywhere from thirty minutes to five hours.[14]  (Doc. 20 at ¶ 5.)  She was responsible for distribution of employee handbooks and was authorized to answer employee questions regarding Dollar General policies. *Id.* at ¶ 12.  She was also responsible for ensuring that Defendant's SOP manuals were followed at her store and she had the authority to discipline all the employees in the store.[15]  *Id.* at ¶ 13.  However, Francis spent most of her time stocking the store.  (Doc. 50 at ¶ 9.)

---

[14]Francis had two successive District Managers over the course of her employment: Bill Dickinson and Mark Nichols.  (Doc. 20 at ¶ 5.)  Francis estimates that Dickinson visited the store anywhere from once per week to once per month, and Nichols visited the store approximately once per month.  *Id.*

[15]The record reveals that Francis was empowered to discipline employees, but she did not have the authority to terminate their employment.  *Id.* at ¶ 13.  In fact, the Progressive Counseling Records completed by Francis indicate that she disciplined both store clerks and her assistant store manager for company policy violations and then provided an action plan to correct future problems.  *Id.*

E.     Regina Franklin.[16]

Franklin has been employed at store #7101, in Fultondale, Alabama, as a store manager since April 2002.  (Doc. 16 at ¶ 1.)  During this time, she has been compensated on a salary basis of between $600 and $725 per week, and received several "Teamshare" bonuses.  *Id.* at ¶¶ 5, 7.  Franklin earns twice as much as the next highest paid employee in her store.  *Id.*

Franklin's district managers visit her store periodically and the frequency of the visits varies per district manager.[17]  *Id.* at ¶¶ 3, 4.  She has made recommendations about pay raises and promotions which were accepted.  *Id.* at ¶ 10.  For example, Franklin made recommendations that two employees be promoted to full-time positions and that her assistant store managers and other employees receive pay raises.

Franklin spends the majority of her time in the store performing the same tasks as other employees.  (Doc. 52 at ¶ 2.)  In fact, she feels like her

---

[16]The documents cited in this fact section are from *Franklin v. Dolgencorp, Inc.,* 7:06-CV-2165-LSC.

[17]One district manager (Nichols) visited the store once every three to four weeks; she "didn't see [Warren] that much."  *Id.*  Her new district manager (Paolillo), who has been a district manager for only several months, visits weekly.  *Id.*  The regular district manager's visits last less than two hours, and 95% of the visits were solely to meet with her.  *Id.*

physical labor has attributed more to the profitability of the store than hiring the right people.  *Id.*

>    F.    Michael Hadaway.[18]

Hadaway served as store manager of Defendant's store #8844 in Forestdale, Alabama, from April 2002 to October 2002.  (Doc. 21 at ¶ 1.)  He was paid a salary of $650 per week while his assistant managers earned between $7.00 and $9.50 per hour.[19]  *Id.* at ¶¶ 5, 6.  Although he was told he would be working 45 hours per week, Hadaway claims that he worked an average of 65 hours per week because he did not have a sufficient payroll budget to hire anyone else.  (Doc. 46 at ¶ 9.)

Hadaway reported to a district manager; however, he could only recall one specific visit by district manager Mark Nichols and two visits by his subsequent district manager, Ed Gerhardt, over a six month period of time. *Id.* at ¶ 4.  On one occasion, Hadaway was sent by his district manager to another store to help clean up and put out freight, which took two days.

---

[18]The documents cited in this fact section are from *Hadaway v. Dolgencorp, Inc.*, 7:06-CV-2171-LSC.

[19]According to Hadaway, the Assistant Store Managers typically worked between 32 and 36 hours per week, which translates into weekly pay of between $224 and $342 per week.  *Id.* at ¶ 7.

(Doc. 46 at ¶ 10.)  Hadaway did not change the hours on the schedule and never performed a written employee performance evaluation.[20]  *Id.* at 1-2. About two days per week, Hadaway claims that he was the only employee in the store, due to payroll constraints.  *Id.* at ¶ 4.  When there was a broken window at the store, the district manager told Hadaway that he would call him back and let him know who was coming to fix the window. *Id.* at ¶ 2.  Hadaway never moved merchandise around in the store, to make it more appealing to customers, because he was under the impression that he had to stick to the plan-o-gram.  *Id.* at ¶ 5.

Hadaway often fronted merchandise on the shelves at night, cleaned fingerprints off the door, swept and mopped the floors, and cleaned the restrooms.  He asserts that this was necessary because there was no one to whom he could delegate these duties.  *Id.* at ¶ 6.  Hadaway estimates that he spent 85-90% of his time unloading trucks, stocking shelves, cleaning the store, and working the cash register.  *Id.* at ¶ 8.

---

[20]The Court notes that Hadaway says that he "did not" do these things, not that he "could not."

G.    Cathy Thomas.[21]

Thomas worked as store manager for Defendant's store in Pinson, Alabama, from April 2000 to April 2003, after being promoted from assistant manager.  (Doc. 12 at ¶ 1.)  She was paid on a salary basis of between $500 and $576 per week as store manager which was twice as much as the next highest paid employee.  *Id.* at ¶ 5.  Thomas also received a "Teamshare" bonus in addition to her salary on one occasion.  *Id.*  When promoted, Thomas was told she would work between 42-45 hours a week, however, in practice, she claims that she worked an average of 65 hours per week.  (Doc. 55 at ¶ 1.)

According to Thomas, although her district manager left her daily voicemails, he was "rarely" in her store, visiting once or twice per month for fifteen minutes to an hour.  *Id.* at ¶ 3.  Thomas's promotion recommendations were accepted by her district manager and she was responsible for ensuring that the SOP manual was implemented.  *Id.* at ¶¶ 8, 13.  She claims that she could not deviate from the plan-o-gram, but

---

[21]The documents cited in this fact section are from *Thomas v. Dolgencorp, Inc.,* 7:06-CV-2204-LSC.

admits that she merchandised other areas of the store that accounted for 15% of the store's sales.  *Id.* at ¶ 4.  Thomas also acknowledges that the store manager was ultimately responsible for what happened in her store. *Id.* at ¶ 16.

Thomas spent approximately 85% of her time performing non-managerial tasks and she was sometimes sent to other stores to help with inventory and cleaning.  She estimates that she spent about fifteen minutes per day on paperwork, plus an additional hour per month.  (Doc. 55  at ¶¶ 1, 2, 4.)  She believes the most important aspect of her job as store manager was stocking the shelves because "if merchandise was not on the shelves, the store could not sell it."  *Id.* at ¶ 3.

H.    Wanda Womack.[22]

Womack managed four Dollar General stores in Roebuck, Gardendale, Irondale, and Birmingham from 1997 until 2003.  (Doc 11 at ¶ 1.)  Her salary during that time ranged from $425 to $725 per week, which was approximately twice as much as the next highest paid employee.  *Id.* at 5.

---

[22]The documents cited in this fact section are from *Womack v. Dolgencorp, Inc.,* 7:06-CV-2213-LSC.

Womack also received bonuses based on her store's performance and exercised stock options.  *Id.*  Although Womack was told that she would work 40 to 45 hours per week, she alleges that she worked an average of 60 hours per week, spending 85% of that time performing non-managerial tasks. (Doc. 53 at ¶ 1.)  Womack's district manager visited her stores once per month and the visits usually lasted approximately thirty minutes.  *Id.*  She also received daily voicemails from the district manager.  (Doc. 11 at ¶ 4.)

Womack admits that absent her recommendations, Defendant would have no knowledge of issues or misconduct warranting termination of her store's employees.  *Id.* at ¶ 6.  Womack was also responsible for protecting the company assets; ensuring that Defendant's customers received quality customer service; knowing and enforcing company policies; ensuring that the shelves remained stocked; guarding against employee injuries and reporting any workplace injuries; informing Defendant if employees requested any protected leaves of absence; representing Defendant in legal compliance areas, and in court on shoplifting prosecutions; managing and securing the store's cash and safe; relaying communications from Defendant

to store employees; and reviewing operating reports.  *Id.* at ¶ 8.  Womack often stopped merchandising to attend to managerial functions.  *Id.* at ¶ 6.

Womack was also responsible for non-managerial tasks such as putting out freight, sweeping, and mopping.  (Doc. 53 at ¶ 3.)  She had to obtain the district manager's approval to have light bulbs replaced, windows washed, and the floors cleaned.  (Doc. 53 at ¶¶ 2-4.)  Womack also "did not have to plan her days as a store manager because the overriding chore was putting out freight."  *Id.*

III.    Summary Judgment Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp.*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

"[A]t the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986).  However, judges are not "required to submit a question to a jury merely because some evidence has been introduced by a party having the burden of proof, unless the evidence be of such character that it would warrant the jury finding a verdict in favor of that party.  *Id.* at 251 (*quoting Wilkerson v. McCarthy*, 336 U.S. 53, 62 (1872)).  "This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250.

IV.   Analysis.

    A.    Application of the FLSA and Department of Labor Regulations.

    Congress enacted the FLSA in order to help eliminate the existence of labor conditions that are detrimental to the health, efficiency, and welfare of workers in the United States.  *See* 29 U.S.C § 202(a).  To accomplish this goal, the FLSA includes a maximum hour provision, which requires that

employers pay employees at least one and one-half their regular pay for hours worked in excess of 40 hours a week.   *See* 29 U.S.C. § 207(a)(1). However, the "goal of ameliorating the uglier side of a modern economy did not imply that all workers were equally needful of protection" by the FLSA. *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1363 (11th Cir. 1997), *cert. denied*, 522 U.S. 949 (1997).  For example, the FLSA's overtime pay requirement does not apply to employees working in "a bona fide executive, administrative, or professional capacity."  *See* 29 U.S.C. § 213(a)(1).

The burden is on the employer to demonstrate that "their employees fit 'plainly and unmistakably within the exemption's terms  and spirit,' and like each of the other exemptions to the FLSA, [the executive exemption] is to be narrowly construed against the employer."  *Brock v. Norman's Country Mkt., Inc.*, 835 F.2d 823, 825 (11th Cir. 1988); see also *Avery v. City of Talladega, Ala.*, 24 F.3d 1337, 1340 (11th Cir. 1994); *Nicholson*, 105 F.3d at 1364.

The FLSA authorizes the Department of Labor ("DOL") to develop regulations defining and implementing these exemptions.  *See* U.S.C. § 213(a).  Where Congress expressly delegates regulatory authority to an

administrative agency, regulations adopted pursuant to such authority "are given controlling weight unless they are manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984); *see also Buckner v. Fla. Habilitation Network, Inc.,* 489 F.3d 1151 (11th Cir. 2007) (holding that DOL regulations related to FLSA exemptions are enforceable).  Accordingly, the DOL's implementing regulations guide the Court's analysis.

These regulations set forth two alternative tests, the "long test" and the "short test," that should be used to determine whether an employee meets the executive exemption.  The "long test" is set forth in 29 C.F.R. § 541.1 subsections (a) through the first part of subsection (f).  The latter part of subsection (f) sets out the "short test."  See 29 C.F.R. § 541.1; *Brock v. Norman's Country Mkt., Inc.,* 835 F.2d at 826.  The DOL's "long test" applies to employees earning between $155 and $250 per week, and the "short test" applies to employees earning more than $250 per week. See 29 C.F.R. §§ 541.1, 541.2, 541.119.  Since Plaintiffs earned more than $250 per week while employed with Defendant, the DOL's "short test" will be utilized.

In order to be exempt under the "short test," an employee must: (1) be paid on a salary basis of not less than $250 per week (2) for the primary duty of managing a recognized department or subdivision and (3) regularly direct two or more employees.[23]

The parties agree that both the first and the third prongs of the short test are satisfied with regard to Plaintiffs; therefore, the only question remaining is whether or not Plaintiffs' "primary duty" was management.

The regulations provide guidance as to the definition of the terms "management" and "primary duty."

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of

---

[23]The regulations issued by the DOL defining the executive exemption were amended effective August 23, 2004. *See* 69 F.R. 22122 (April 23, 2004). As a general matter, the new regulations preserve the case law that existed prior to that date by consolidating "the former regulations and interpretations into a unified set of rules and . . . provid[ing] needed simplification and more clarity to a complex regulation." See 69 F.R. 22122-01, 22127 (codified at 29 C.F.R. Pt. 541). All but one (Franklin) of the seven Plaintiffs were no longer employed by Defendant as of the effective date in 2004; therefore, the previous regulations apply to all Plaintiffs except Franklin.

The amended regulations added an additional requirement to the "short test." *See* 29 C.F.R. § 541.100(a). Under the current regulations, whether or not the employee's suggestions and recommendations as to change of status of the other employees are heeded will be given particular weight in determining if the "short test" is satisfied. *Id.* The parties do not dispute that this additional requirement is met with regard to Franklin; therefore, the additional requirement will not be discussed further.

work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

Plaintiffs do not contest that as store managers, they performed many of these management activities.  They contend, however, that because they spent as much as 85% of their time performing non-exempt tasks identical to those performed by hourly, non-exempt employees, management was not their "primary duty."

The regulations put substance before form. The fact that Plaintiffs were given the title of "store manager" is irrelevant as the regulations specifically require an examination, beyond an employee's title, of the specific duties performed by the employee to determine whether the employee's primary duty is management.  *See* 29 C.F.R. §§ 541.103, 541.102.

29 C.F.R. § 541.103 sets out the test for determining an employee's "primary duty."  It states, that "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time.  Thus an employee who spends over 50% of his time in management would have management as his primary duty." 29 C.F.R. § 541.103.  Defendant does not contend that Plaintiffs meet this bright line test, as they clearly spend less than 50% of their working time performing managerial duties.[24]

An employee who spends less than 50% of his or her time on management duties may nevertheless have management as his or her primary duty.  *See* 29 C.F.R. § 541.103.  In fact, the DOL regulations indicate that time spent in performance of managerial tasks is only a "useful guide" in determining if management is an employee's primary duty.  *Id*.  In other words, we do not presume that the executive exemption fails merely because the time spent on exempt managerial tasks is less than 50%.

---

[24]Plaintiffs presented undisputed evidence that the majority of their day was spent in the performance of non-managerial tasks.  Allen, Hadaway, Thomas, and Womack all estimated that they spent 85% of their time at work stocking shelves and doing other non-managerial tasks.  Likewise, the other Plaintiffs also stated that they spent the majority of their time performing non-managerial tasks.

Instead, we weigh the factors listed in § 541.103 to determine whether

Plaintiffs' primary duty was management.   As the regulation explains,

> "Time alone, however, is not the sole test, and in situations where the employee does not spend over 50% of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion.  Some of these pertinent factors are [1] the relative importance of managerial duties as compared with other types of duties, [2] the frequency with which the employee exercises discretionary powers, [3] his relative freedom from supervision, and [4] the relationship between his salary and the wages paid other employees for the kind of non-exempt work performed by the supervisor."[25]

There being no significant legal or factual distinction between these

seven Plaintiffs, the Court will collectively analyze Plaintiffs' circumstances

to determine whether or not the executive exemption applies and,

consequently, whether or not Defendant is entitled to judgment as a matter

of law.

---

[25]The language of 29 C.F.R. § 541.130 does not create an exhaustive list of the factors to be considered by the courts.  However, while there may be other factors which this Court would consider, the parties have confined their arguments to those listed in the regulations.

1.    Importance of Managerial Duties to Defendant.

The first factor for the Court to consider is the importance of Plaintiffs' managerial duties to Defendant.

The manner in which Defendant trains, evaluates, and compensates its store managers demonstrates that Plaintiffs' managerial duties were more important than the non-managerial duties that Plaintiffs performed.  For example, Defendant's store managers received two weeks of training in a Dollar General store and two weeks in a classroom environment.  No other store employee received such formal training.  Also, the seven criteria on which Plaintiffs, as store managers, were evaluated (sales volume; inventory shrink; safety awareness; training and development; controllable expenses; customer satisfaction; and merchandising) are all aimed at determining how well they perform their management responsibilities - not their non-managerial duties.  Finally, Plaintiffs' compensation structure, including the "Teamshare" bonus, which is designed to reward the success and profitability of individual stores, illustrates the value that Defendant placed on Plaintiffs' exercise of their management duties.  No other store employee was compensated to the degree of the manager.

Plaintiffs did, however, typically work between 60 and 80 hours per week in order to complete the work necessary to maintain a profitable store. This was arguably due to labor budgeting constraints making it impossible for them to hire additional employees to perform required non-exempt duties. As a result, a large percentage of their time was spent performing non-managerial tasks. Plaintiffs argue that this shows that the most important aspects of their jobs, as the store managers, was putting out freight, keeping the store clean, and having the store well merchandised, as opposed to making good managerial decisions.

Regardless, Plaintiffs' performance of non-managerial duties does not alter the fact that on a day-to-day basis, Plaintiffs, as store managers, were charged with handling, among other things, the individual stores' customer relations, appearance, loss prevention, and cash intake. They were responsible for deciding, within Defendant's guidelines, the best way to carry out these functions. To this end, Plaintiffs were vested with a significant amount of control over store personnel, both in terms of hiring and supervising their activities.

Even while performing the non-exempt tasks alongside their subordinates, Plaintiffs were simultaneously tasked with the responsibility of ensuring that Defendant's policies were being carried out.  At all times, Plaintiffs were the store managers.  When they were stocking the shelves or running the cash register, they were still charged with acting as the store manager in the event that role was needed.  While Plaintiffs could (and apparently did) perform many of the non-managerial roles of other employees in the store, none of the other employees were authorized to perform Plaintiffs' role as store manager.

The fact that they were to exercise their managerial discretion within the guidelines imposed by Defendant's operating policies does not necessarily undermine the importance of Plaintiffs' managerial duties to Defendant.  Even though many of the decisions made by Plaintiffs, as store managers, were scripted in the SOP manual or plan-o-gram, Defendant nonetheless depended upon Plaintiffs to follow the manual and assure that the other employees did as well.  Defendant employs its managers to carry out the tasks that it believes are important to maintaining a profitable and successful enterprise, and the store managers are trained, evaluated, and

compensated differently based on their responsibility for carrying out these tasks.

This factor clearly indicates that Plaintiffs were properly classified as exempt.

### 2.   Exercise of Discretion.

The regulations also direct this Court to consider the frequency with which the store managers exercised discretion as a factor to consider in determining the managers' "primary duty."

Defendant correctly asserts that the regulations do not require limitless discretion or ultimate veto power in order to find management as an employee's primary duty.  *See* 29 C.F.R. § 541.103.  However, Plaintiffs contend that the extent of the presence of district managers and detailed instructions, in the form of operating manuals, tends to show that Plaintiffs rarely exercised discretion.   Plaintiffs argue that many of the store managers' administrative functions are so routinized that, in reality, they require very little discretion at all.  For instance, Plaintiffs were not allowed to hire members of the store's management team without the district managers participation and interview.  Further, they were not allowed to

deviate from the range of starting pay for new hires prescribed by Defendant without getting district manager approval.  In addition, any repairs generally had to be handled through the District Manager or the corporate office and store managers could not prosecute shoplifters or obtain security equipment.

Even though Plaintiffs were required to implement strict policies and procedures found in the SOP manual and the plan-o-grams, many of their decisions did involve discretion.  For instance, Plaintiffs were required to: schedule subordinate hours, apportion payroll budgets, delegate, assign, and prioritize tasks, train employees, counsel employees, appraise employee performance, resolve customer service issues, and determine how to best implement company policies and procedures.  They may not have been permitted to promote or fire employees, but they did exercise their discretion in recommending to the district manager when such employment action was appropriate.  No other employees had such input.

The fact that Plaintiffs had to consult manuals or guidelines does not preclude a finding that they exercised discretion or independent judgment. The Second Circuit's discussion in *Donovan v. Burger King Corp.*, 675 F.2d

516 (2nd Cir. 1982) ("Burger King II") of the relationship between a manager's need to follow detailed corporate policies and their FLSA status, while not binding on this Court, is instructive on this point:

> We fully recognize that the economic genius of the Burger King enterprise lies in providing uniform products and service economically in many different locations and that adherence by assistant managers to a remarkably detailed routine is critical to commercial success. The exercise of discretion, however, even where circumscribed by prior instruction, is as critical to that success as adherence to "the book." Burger King, of course, seeks to limit likely mistakes in judgment by issuing detailed guidelines, but judgments must still be made. In the competitive, low margin circumstances of this business, the wrong number of employees, too many or too few supplies on hand, delays in service, the preparation of food which must be thrown away, or an underdirected or undersupervised work force all can make the difference between commercial success and failure.

*Id.* at 521-22.

Plaintiffs' daily exercise of discretion in the manner with which they carried out Defendant's policies and procedures supports Plaintiffs' classification as exempt.

### 3. Relative Freedom from Supervision.

Plaintiffs' relative freedom from supervision is another factor this Court must consider in determining Plaintiffs'"primary duty."

Plaintiffs received voicemails from their district manager on a daily basis. These messages often contained directives that related to substantive issues concerning the operation of the store. But, even though they received daily voicemails, it is undisputed that Plaintiffs were generally the highest level of supervisory personnel in the stores on a daily basis. It was by all accounts a rare event for a district manager to visit any store more than once a month. The district managers did not even have keys to the stores and were typically responsible for overseeing between 15-20 stores.

This factor weighs in favor of finding Plaintiffs exempt from the overtime requirement.

### 4.   Salary Comparison.

The relationship between Plaintiffs' salary and the wages paid to Defendant's other employees is the final factor for the Court's consideration.

Defendant compensated Plaintiffs, through salary and bonuses, at a significantly higher rate than other store employees. Although there is no specific formula to determine whether a manager earns significantly more

than the next senior employee, Plaintiffs, on average, earned approximately twice as much as the next highest paid employee in their store.

Plaintiffs argue that their salary, divided by the number of hours they worked, not their weekly salary, should be compared to the non-exempt employee's hourly rate of pay.  This comparison, however, runs contrary to the regulations.[26]  The language of 29 C.F.R. § 541.103 calls for a comparison of the "salary" of the allegedly exempt employee to the "wages" of other non-exempt employees.

In *Moore v. Tractor Supply Co.,* 352 F. Supp. 2d. 1268, 1278-79 (S.D. Fla. 2004), *aff'd.*, 2005 U.S. App. LEXIS 14191 (11th Cir. 2005), the plaintiff argued that if his salary was divided by the number of hours he worked and converted to an hourly rate, his hourly rate would actually be lower than the hourly rate paid to non-exempt employees.  The court rejected this comparison and simply compared the salaried employee's weekly salary to the highest possible weekly wage earned by the non-exempt store employees.  In addition, Plaintiffs' own expert indicates that such a

---

[26]Plaintiffs failed to provide a single published opinion to support their argument that the Court should compare Plaintiffs' hourly earnings to those of other store employees.

comparison should not be done on an hourly basis.  *See* Comm. Evid. 4, Farrington Depo. pp. 115-17.

This factor clearly supports a determination that Plaintiffs are exempt.

B.      Application of Summary Judgment Standard to the Facts.

The material facts in this case are clear and undisputed.  The only dispute relates to who should interpret those facts in applying the law.

In *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714 (1984), the Supreme Court said that:

> "[t]he question of how the [Plaintiffs] spent their working time . . . is a question of fact.  The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law which . . . is governed by the pertinent regulations promulgated by the Wage and Hour Administrator."

*See also Cheatham v Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (holding "the ultimate decision whether an employee is exempt from the FLSA's overtime compensation provisions is a question of law" (quoting *Lott v. Howard Wilson Chrysler-Plymouth*, 203 F.3d 326, 331 (5th Cir. 2000))). *But see Shockley v. City of Newport News*, 997 F.2d 18, 26 (4th Cir. 1993) (holding that the amount of time devoted to managerial duties, and the significance of those duties, present factual questions); *Spinden v. GS*

*Roofing Prods. Co.*, 94 F.3d 421, 426 (8th Cir. 1996) (finding that in FLSA exemption analysis, the amount of time devoted to administrative duties, and the significance of those duties, present factual questions).

The dispute in this case is not whether Plaintiffs performed duties that the regulations classify as "managerial" but whether management was their "primary duty."  The question is also - when the regulations are laid over the undisputed facts of this case, do they point so clearly to a result that it is no longer an issue for the jury to decide?

Plaintiffs interviewed, selected, and trained employees; set employees' hours; directed employees' work and assessed their job performances, including promotion recommendations; handled employee grievances; planned and apportioned the workload of the store among the employees; controlled the flow of merchandise in the store; saw to the safety of employees and to the security of the premises; controlled budgets; and monitored and implemented legal compliance measures.  Plaintiffs were also trained, evaluated, and compensated differently from other employees. There is no other explanation for this disparate treatment other than the

conclusion that it was based on their position as the employee Defendant relied upon to manage the store on a day-to-day basis.

Furthermore, there is no dispute that Plaintiffs exercised frequent discretion as store managers. Defendant vested its store managers with the responsibility of assuring that the in-store employees carried out the policies set forth in the SOP manuals on a daily basis. Defendant produced evidence that Plaintiffs exercised daily discretion in the way these policies and procedures were implemented. Plaintiffs were required to: schedule subordinate hours, apportion payroll budgets, delegate, assign, and prioritize tasks, train employees, counsel employees, appraise employee performance, resolve customer service issues, as well as recommend who to hire or fire.

In addition, there is no dispute as to how often Plaintiffs were supervised. The district managers were rarely in the stores. The fact that the district managers left voicemail directives on the store's answering machines is insufficient to establish that the store managers were not relatively free from supervision.

Finally, there is no dispute as to how Plaintiffs were compensated. Plaintiffs earned between 170% and 246% more than the highest paid non-exempt employee.  This certainly evidences the value Defendant placed on Plaintiffs' managerial function.

Once Defendant has met its burden of showing there is no genuine issue of material fact, Plaintiffs must point this Court to evidence of a factual dispute such that a reasonable jury could conclude that Plaintiffs' primary duty was not managerial.  *See Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The most significant argument made by Plaintiffs is that the amount of time they spent in the performance of non-managerial duties creates an issue of fact as to whether management was their "primary duty."  (Doc. 50.)  It is undisputed that Plaintiffs spent 85% of their time in the performance of non-managerial duties.  But does this actually create an issue that should be decided by a jury?

Several district courts in the Eleventh Circuit have held that  summary judgment is appropriate under facts almost identical to those in this case. *See Posley v. Eckerd Corp.*, 433 F. Supp. 2d 1287 (S.D. Fla. 2006) (court

granted summary judgment finding store managers' primary duty was management despite spending 80% or their time on non-management tasks); *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268 (S.D. Fla. 2004) (court granted summary judgment even though plaintiff argued that he spent 95% of his time on non-exempt tasks); *Strum v. TOC Retail, Inc.*, 864 F. Supp. 1346 (M.D. Ga. 1994) (court granted summary judgment even though more than 50% of their time was spent performing non-managerial work); *Thomas v. Jones Rest., Inc.*, 64 F. Supp. 2d 1205 (M.D. Ala. 1999) (although plaintiff asserted that more than 50% of his time was spent on performing non-managerial tasks, the court granted summary judgment); *Jackson v. Advance Auto Parts,* Inc., 362 F. Supp. 2d 1323 (N.D. Ga. 2005) (court granted summary judgment even though plaintiffs spent 60% to 90% of their time performing non-exempt duties); *Debrecht v. Osceola County*, 243 F. Supp. 2d 1364 (M.D. Fla. 2003) (court granted summary judgment despite plaintiffs' claim that they spent 85% of their time performing non-exempt tasks); *Bosch v. Title Max,* Inc., 2005 U.S. Dist. LEXIS 5034 (N.D. Ala. 2005) (court granted summary judgment finding plaintiffs' primary duty was management); *Severin v. Pasha's Rests. Inc.*, 2007 U.S. Dist. LEXIS 24834

(S.D. Fla. 2007) (court granted summary judgment despite the fact that plaintiff spent 80% of her time on non-managerial tasks).

Furthermore, the First, Second, Eighth, and Ninth Circuits have all held managers of retail establishments to be exempt, despite the fact that the managers spent the vast majority of their time performing non-exempt tasks and followed detailed procedures set forth in policy manuals.  *See Donovan v. Burger King Corp.*, 672 F.2d 221 (1st Cir.1982) ("Burger King I") (overruled the lower court's judgment from a bench trial and held that assistant store managers were exempt despite the fact that over 50% of their time was spent on non-managerial duties); *Donovan v. Burger King Corp.*, 675 F.2d at 521-22 (" Burger King II ") (affirmed the lower court's judgment that assistant store managers who spent more than 50% of their time performing non-exempt work were properly found to be exempt); *Murray v. Stuckey's Inc.*, 939 F.2d 614 (8th Cir.1991) (reversed the lower courts judgment from a bench trial and held that plaintiff met the primary duty test despite spending between 60% and 90% of their time on non-exempt tasks); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104 (9th Cir. 2001) (summary

judgment was appropriate for managers at a recreational vehicle park who spent 90% of their time performing non-exempt work).

Additionally, this Court cannot find where any circuit court has ever held that the manager of a retail establishment was improperly classified as exempt based on facts even remotely similar to those in this case.

Despite these holdings, this Court struggles with the appropriateness of summary judgment based on what could be seen as a mixed question of law and fact.  Apparently this troubles the Fourth and Eighth Circuits as well.  *See Shockley*, 997 F.2d at 26; *Spinden*, 94 F.3d at 426.

The language of 29 C.F.R. § 541.103 also supports Plaintiffs' position that the ***significance*** of their non-exempt work, as compared to their managerial work, should be decided by the jury.  The regulation provides that "[t]he time spent in the performance of the managerial duties is a ***useful guide*** in determining whether management is the primary duty of an employee."  29 C.F.R. § 541.103 (emphasis added).  However, "he ***might*** nevertheless have management as his primary duty if the other factors support such a conclusion."  *Id*. (emphasis added).  "***Some*** of these pertinent factors are . . . relative importance . . . discretionary powers . . .

freedom from supervision . . . wages." *Id.* (emphasis added).  This language unquestionably creates some ambiguity, especially when considering a motion for summary judgment, where the court seeks to determine if any "reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224.

On the other hand, 29 C.F.R. § 541.103 concludes with an example that appears to clear up the ambiguity as it relates to these Plaintiffs.  After listing the factors to consider, the regulation states:

> For example, in some departments, or subdivisions of an establishment, an employee has broad responsibilities similar to those of the owner or manager of the establishment, but generally spends more than 50% of his time in production or sales work.  While engaged in such work he supervises other employees, directs the work of the warehouse and delivery men, approves advertising, orders merchandise, handles customer complaints, authorizes payment of bills, or performs other management duties as day-to-day operations require.  ***He will be considered to have management as his primary duty***.

29 C.F.R. § 541.103 (emphasis added).

Apparently, the example was written with this fact scenario in mind.  Further, the example is not mere commentary by an author as to his or her

interpretation of the regulation.  It is part of the actual regulation itself and, thus, is to be applied as part of the regulation.

While the Eleventh Circuit has not spoken as to these specific facts in a published opinion concerning the appropriateness of granting the requested summary judgment, the Court can look to an Eleventh Circuit opinion related to another FLSA exemption for guidance.

In *Hogan v. Allstate Ins. Co.*, 361 F.3d 621 (11th Cir. 2004), the Eleventh Circuit affirmed the granting of a motion for summary judgment under the administrative exemption.  In holding summary judgment was appropriate, the Eleventh Circuit found that the lower court properly determined, viewing the facts in the light most favorable to the non-moving party, that the employee's "primary duty" was administrative.  This, while not controlling on the substantive issue, does shine some light on the Eleventh Circuit's treatment of fact versus law determinations when considering FLSA exemptions on summary judgment.  Following that precedence, as well as the reasoning set forth herein, summary judgment is due to be granted.  No reasonable jury could return a verdict for Plaintiffs.

Based on this ruling, there is no need to address the remaining issues raised by Defendant.

V.     Conclusion.

For the reasons stated above, Defendant's Motions for Summary Judgment will be granted.  The Court will also schedule a teleconference to determine the most appropriate course of action for the remaining 6,003 individual cases.  This ruling should not necessarily be taken as an indication of how the Court will rule in the remaining cases.  A separate order in conformity with this opinion will be entered.

Done this <u>20th</u> day of <u>September 2007</u>.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153